The Chicago and Alton Railroad Company

*v.*

Timothy O'Neil, Admr.

*Opinion filed April 21, 1898.*

1. Railroads—*when a verdict finding defendant guilty of gross negligence will not be set aside.* A verdict finding the defendant railroad company guilty of gross negligence upon the plaintiff's uncontradicted evidence that the servants of the company, after nightfall, uncoupled a car from a backing train while moving and "kicked" it in upon a siding, unattended by a brakeman and without a light, at a time when such servants knew that a great many people were walking upon such siding, will not be set aside, on appeal.

2. Evidence—*when city ordinance regulating movement of trains is admissible.* A city ordinance providing that railroad trains, when backing, shall "have a conspicuous light in the rear car or engine," etc., is admissible under evidence that the servants of the defendant railroad company, in the night time, uncoupled the rear car of a switching train while moving backward and "kicked" it in 'upon a siding without a light.

*Chicago and Alton R. R. Co.* v. *O'Neil,* 64 Ill. App. 623, affirmed.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. S. Tuthill, Judge, presiding.

Frank O. Lowden, and Robert Mather, for appellant.

P. O'Neil Byrne, and Michael E. Ames; (Edward J. Walsh, of counsel,) for appellee.

Mr. Justice Carter delivered the opinion of the court:

Appellee recovered a judgment against appellant in an action on the case for the alleged negligent or wrongful killing of Mrs. Ellen O'Neil, and the Appellate Court has affirmed that judgment.

Mrs. O'Neil was employed in labeling cans at the packing house of Nelson Morris & Co., at the stock yards in

Chicago, and on quitting work for the day, about 5:45 o'clock, January 19, 1892, left that place for her home, it being then dark. The packing house was situated on the north-west corner of Forty-third street (a street running east and west) and an open space extending north and south, upon which open space several railroad tracks were laid and in use. This open space was called by two of the witnesses "Loomis street." Upon this open space, north of Forty-third street, were standing some freight cars. A switch engine was attached and these cars were backed, and one of them was switched south soon after Mrs. O'Neil left her place of work. She crossed Forty-third street and proceeded south on Loomis street, so called, walking part of the way on a track on which cars were switched to the platform of the beef-house of her employer, just south of Forty-third street. She was in company with another woman, and apparently did not observe the car coming behind her on the track until it was within a few feet of her, when she stepped off the track to the right, next to the platform, while the other woman stepped to the left. The doors of the car were swinging doors, and the one on the right was open, and for that reason projected outward some nine inches further than when closed. Owing to this fact there was not sufficient room between this projecting door and the platform, which was about four feet high, for the car to pass without injuring the deceased, and the consequence was she was struck and killed. There was no brakeman upon the car, and no light upon it, although it was then quite dark. The car had been sent down the track by what is known as "kicking,"—that is, it was uncoupled from the other cars while in motion imparted by the switch engine, and under the impulse of this motion ran but a few feet beyond the place where it struck Mrs. O'Neil. She could have gone home by another route, but not so conveniently and not without passing over other railroad tracks. There were a great many people employed in

the various establishments about this part of Loomis
street, so called, who passed back and forth over this
space at pleasure in going to and returning from their
several employments.   One witness testified: "It was
about a quarter to six; there would be hundreds of peo-
ple on the tracks at that time, because it was just after
quitting time."

The engineer who had charge of the engine when this
car was "kicked" down on the track in question, testified:
"A person could uncouple cars going three or four or five
miles an hour.  When I got the signal in this case to stop,
my locomotive was about Forty-third street.   When the
pin was pulled I do not remember the rate of speed I was
running,—probably six or eight miles an hour.   The car
that was let go would lessen its speed.   There is no way
of getting out of the building without crossing the rail-
road track, either to the north, south, east or west.   The
employees there came from all directions.  I did not know
of the accident until a few seconds after it happened.   I
did not see the woman.   I saw people going back and
forth.   There is a swarm of people at that time of the
evening.   I did not know anything of the accident until
the night engineer stepped on the engine and said, 'You
have killed a woman.'   The employees of the factories
were coming from Armour's from the east, coming from
Nelson Morris' towards the east, and a great many peo-
ple coming right up south between these tracks.   There
is quite a space between the tracks, and they take that
way in getting home.   In fact, they come from all direc-
tions.   There are hundreds of people in that vicinity at
that time of the evening.   They never use head-lights on
cars.   There was no light of any kind upon that car, un-
less the switchman was hanging on the car."   He also
testified that at the time of the accident he was in the em-
ploy of the Chicago Railway Switching Association, (an
association for switching purposes, formed by mere agree-
ment between different railroad companies, including ap-

172—34

pellant,) which switched cars for these various companies, and that he was then handling an engine of appellant. He further testified: "On January 19, 1892, we were doing work for Nelson Morris & Co. We were switching on Nelson Morris' beef-house track at the time of the acci-dent,—switching out loads and throwing empties into Nels Morris' track. * * * There is but one rail off on the main tracks that leads to three different rails. Nels Morris' track runs north and south after it gets one hun-dred feet from Forty-third street. There is a curve in the platform. The cars that we were switching upon Nels Morris' track we were switching south."

The vice-president and general manager of the ap-pellant company testified: "The stock yards company owned the tracks in and about the stock yards, and to a connection with nearly all the railroads in the city of Chicago, for which they charged the railroad companies a trackage. Every car that passes over those tracks pays to the stock yards company revenue. When they get to the stock yards they must be delivered to the pack-ing houses and different industries, and it was for that purpose that this association was formed. The stock yards company receive their revenue from the trackage, and give to the railroad company the right to come there and use their tracks by this association, by reason of get-ting that revenue."

There was no other evidence as to the ownership or possession of the particular track or ground where Mrs. O'Neil was killed, nor as to the question whether she was at the time a trespasser or not. The court ordered to be stricken from the record so much of the testimony of one of the witnesses as implied that what the witness called "Loomis street" was a public street.

At the close of plaintiff's evidence the defendant asked the court to instruct the jury that the plaintiff had failed to make a case against the defendant, and that they should find the defendant not guilty. This instruction

was refused, but, the defendant not offering any evidence, the court upon its own motion gave to the jury the following instruction:

1. "The jury are instructed that in order to find a verdict against the defendant in this case, and under the pleadings in the case, you must believe, from the evidence, that the injury to and the death of said Ellen O'Neil was caused as stated in the declaration, or in some one or more of the counts thereof, by the defendant, and that in so causing such injury at the time and place thereof, as appears from the evidence, the defendant was then and there guilty of a degree of negligence so gross as to amount to a willful, reckless and wanton disregard of the rights and safety of said Ellen O'Neil. It is not necessary that the action of the defendant shall be shown, by the evidence, to have been willful, in the sense that it was intentional on the part of the defendant or its servants, but before you can render a verdict against the defendant in this case you must believe, from a fair and impartial consideration of all the evidence in the case, that the injury to and the death of said Ellen O'Neil was the proximate result of such a want of care and regard for the rights and safety of others (in other words, of such gross negligence,) as justifies the presumption of willfulness or wantonness on the part of the defendant."

The principal contention of appellant is, that the evidence, giving full effect to it and to all reasonable and just inferences arising therefrom, was not sufficient to authorize a verdict against appellant, and that the court erred in refusing appellant's motion, made at the close of the testimony, to instruct the jury to find the defendant not guilty. This question is thus presented as a question of law, and we have above recited more of the evidence than would otherwise have been necessary.

The declaration, consisting of nine counts, did not allege in any of them that Mrs. O'Neil was killed on a public street, but in some of the counts the allegation

was that it was at a "public place," in others "a public place open to the public," in others these allegations were omitted, but all of the counts alleged that the several acts of the defendant set out as the cause of the killing were done negligently, recklessly, wantonly and willfully. There was no other evidence than as above stated to support the counts in the declaration that the deceased, when killed, was at a "public place," except that a great many people passed back and forth over this place mentioned as Loomis street Nor is it at all clear from the record who owned or had possession of the track or the *locus in quo* where the deceased was killed. The jury could not, from the evidence, believe otherwise than that the place was used by hundreds of pedestrians, and that the engineer knew when he "kicked" the car down the track without any brakeman or light upon it, that "swarms" of people were then passing over the tracks in every direction. In this view of the evidence we do not think the case turns on the question whether or not the *locus in quo* was a public street or a "public place open to the public;" but if it did, in the absence of any evidence that it was the exclusive right of way of the railroad companies or of appellant, we are not prepared to say that there was no evidence upon which the jury could base a finding that it was a "public place open to the public." In the one case the defendant's liability would depend on the question whether the injury was caused by its negligence, as alleged, while the deceased was using due case for her own safety, while in the other the defendant would not be liable unless the negligence of its engineer or trainmen in "kicking" the car down the track at the time, in the manner and under all of the attending circumstances, was so gross as to amount to a reckless, wanton or willful disregard of the safety of others or of the deceased, as the court charged the jury in the instruction above set out.

We think it would have been an invasion of the province of the jury had the court given the instruction to the jury to find the defendant not guilty. It must be noted that the defendant submitted no evidence whatever, and left wholly unexplained the evidence tending to prove that the *locus in quo* was openly used jointly by the railroads and the public, and left unexplained the doubt arising from the evidence as to its ownership. It is true, one of the witnesses for plaintiff testified that the stock yards company owned the tracks in and about the stock yards, and then when the cars get to the stock yards they must be delivered to the packing houses; but whether it owned this track mentioned by one witness as Nelson Morris' beef-house track, or whether it was on its exclusive right of way, the evidence is uncertain.

In *Pittsburg, Fort Wayne and Chicago Railway Co.* v. *Callaghan,* 157 Ill. 406, (a case in some respects similar to this,) we said (p. 412): "Whether the place of the occurrence of this accident was a street or not is not material to this case. It is not shown to have been private property of plaintiff in error. It appears that for at least three years before the accident it had been used as a passageway and crossing by hundreds of people daily. It was on a curve, where the view of those operating the trains and those seeking to pass over was obstructed. Under such circumstances as this it was the duty of those having control of trains to use care commensurate with the danger.— *Wabash, St. Louis and Pacific Railway Co.* v. *Wallace,* 110 Ill. 114; *Peoria, Pekin and Jacksonville Railroad Co.* v. *Siltman,* 88 id. 529; Patterson on Railway Accident Law, sec. 170."

If it be conceded that it was negligence for the deceased to walk upon the railroad track in question, whether in a place open to the public or not, still it must be observed that she was not struck or injured on the track, but after she had stepped aside to a place

where she would have been safe had the swinging car door been closed and fastened, as it should have been.

Again, on the theory that the jury found the negligence of the defendant was of that character as to amount to a reckless disregard of the safety of others, under the instruction numbered 1, above mentioned, we cannot say there is such insufficiency of evidence to support the verdict on this phase of the case as to justify this court in reversing the judgment on that ground after the affirmance of the judgment by the Appellate Court. The cases cited by appellant where trespassers upon the right of way of the railroad company have been injured are here only remotely in point. It cannot be said, as a matter of law, that it was established by the proof that the deceased was injured while she was trespassing upon the right of way of appellant, or of its agent, the association. If the jury believed, from the evidence, that the servants of the appellant uncoupled this car while it was running several miles an hour, and sent it down the track in question in the darkness without a light upon it and unattended by a brakeman, and at a time and place when and where, as they well knew, great numbers of people employed in the adjacent establishments were passing in all directions on their way home, their finding that the injury was recklessly and wantonly inflicted cannot, on this record, be disturbed by this court.

It is next urged that it was error to admit in evidence this ordinance of the city of Chicago: "Every locomotive engine, railroad car or train of cars running in the night time on any railroad track in said city, shall have and keep, while so running, a brilliant and conspicuous light on the forward end of such locomotive engine, car or train of cars. If such a train be backing, it shall have a conspicuous light in the rear car or engine, so as to show in the direction such car is moving." Even if the car could not be regarded as a railroad car running in the night time, if it was the rear car of a train backing

in the night time the ordinance was applicable and was properly admitted.

Some other questions of minor importance have been discussed by counsel, but we find no harmful error in the decisions of the court respecting them.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*